**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 08-592** |
| | : | |
| **JOHN P. KAROLY, JR.,** | : | |
| **JOHN J. SHANE,** | : | |
| **JOHN P. KAROLY, III and** | : | |
| **HEATHER J. KOVACS** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                           **July 1, 2009**

**I. INTRODUCTION**

John P. Karoly, Jr. has moved to dismiss the indictment[1] on the grounds that the government violated his Fifth and Sixth Amendment rights and denied him due process of law.  Specifically, he complains that a government agent interviewed him the week before the indictment was filed to learn about aspects of his defense strategy.  The government interviews were recorded by the FBI and conducted by an "undercover agent."  Because no indictment had been filed against Mr. Karoly when he spoke to the government agent and because his statements were neither compelled nor incriminating, his motion will be denied.

---

[1]Mr. Karoly moved to dismiss the indictment on March 10, 2009.  Two days later, on March 12, 2009, the government filed a superseding indictment and added additional counts against him for money laundering and tax fraud.

## II. BACKGROUND

This case arises out of the alleged will fraud committed by defendants John P. Karoly, Jr., Esquire, his son, J.P. Karoly, Esquire, and Dr. John J. Shane.  On February 2, 2007, Mr. Karoly's brother and former law partner, Peter Karoly, Esquire and his wife, Dr. Lauren Angstadt, a dentist, died in a private plane crash in Massachusetts.  The couple had executed wills in 1985.  After their deaths, the defendants produced and attempted to probate wills dated June 2, 2006 that had been found in one of Mr. John Karoly's client's storage units.

The validity of the 2006 wills was contested in Northampton County Orphans Court by two members of the Karoly family who alleged that the wills were fraudulent and the signatures forged.  It appears that the will contest case is not currently being litigated.

 On May 17, 2007, the FBI searched Mr. John Karoly's home.  That same day, Robert Goldman, Esquire advised the government (by telephone) that he represented Mr. John Karoly, Esq. in the ongoing grand jury investigation.  Attorney Goldman confirmed his representation of Mr. Karoly by letter to the government on May 25, 2007.  All correspondence and grand jury subpoenas for Mr. Karoly were sent to Mr. Goldman from that date forward.

On July 11, 2007, Mr. Karoly met with Mark Mendelson, a Philadelphia real estate developer, who, at the time, was acting on behalf of the government.  Mr. Karoly

2

represented Mr. Mendelson in a personal injury case and, apparently, had represented him in a real estate transaction in the Lehigh Valley.  Mr. Mendelson had recently been sentenced in a fraud case in federal court and was waiting to learn where he would be serving his sentence.  Mr. Karoly was aware of Mendelson's federal charges and his sentence.  The two men met at a restaurant in Quakertown, Pennsylvania and discussed the federal investigation into Mr. Karoy's alleged participation in will fraud.  According to the government, Mr. Karoly asked Mr. Mendelson what efforts he could take to end the investigation.  Gov't Resp. at 5.  The exact statements made by Mr. Karoly in this meeting are unknown.  Apparently, the wire worn by Mr. Mendelson was not able to record the conversation audibly.

On September 11, 2008, Mr. Mendelson met with F.B.I. special agent Thomas Marakovits and stated that Mr. Karoly had contacted him in August 2008 about the will fraud investigation and that Mr. Karoly had stated that he had to meet with him.  On September 16, 2008, Mr. Mendelson contacted Mr. Karoly by phone and Mr. Karoly stated the two should "meet and go over a couple of things."  Gov't Resp. at 7.  The two men arranged to meet at Mr. Mendelson's home in Villanova, Pennsylvania two days later.

On September 18, 2008, Mr. Mendelson consented to having his interview with Mr. Karoly video recorded by the government at his home.  Mr. Karoly drove from his law office in the Lehigh Valley in the afternoon and met with Mr. Mendelson.  During the

3

meeting, Mr. Karoly spoke about his defense and his strategy with respect to the tax and will fraud charges that might be filed against him.  Mr. Mendelson suggested repeatedly that a donation to certain politicians could make the case against him go away.

The next day, on September 19, 2008, Linda Dale Hoffa, Esquire, the chief of the criminal division at the United States' Attorney's Office, met with counsel for all defendants in this case[2] regarding the possibility of an indictment being returned in this case.  AUSA Weber was also present at the meeting.  On September 25, 2008, the government informed defense counsel that they would present the case to the grand jury for indictment.  Mot. to Dismiss, Ex. 13.

## III. DISCUSSION

### A. The government's actions did not violate the Rules of Professional Conduct.

Rule 4.2 of the Pennsylvania Rules of Professional Conduct (the "no-contact" rule) prohibits attorneys from communicating "about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law."  Rule 8.4(a) prohibits attorneys from knowingly assisting another in violating the rules.  The defendants argue that the prosecutor in this case, Seth Weber, Esquire, violated the no-contact rule by having an undercover agent for the government contact Mr. Karoly, elicit

---

[2]Heather Kovacs was not indicted until March 12, 2009.  Although she was not part of the meeting on September 19, 2008, she later retained Mr. Tom Bergstrom, Esquire to represent her. Attorney Bergstrom was representing J.P. Karoly in September 2008 and was therefore present for the discussion with the United States Attorney's Office in September 2008.

statements about his possible defenses and video-tape the conversation several days before issuing the indictment.  In order to gain dismissal of the indictment on the grounds of an ethical violation, Mr. Karoly must show (1) that AUSA Weber violated Rule 4.2, (2) that Mr. Karoly was "represented by counsel at the time the statements were elicited," and (3) that the remedy he requests is appropriate.  See United States v. Grass, 239 F. Supp.2d 535, 539 (M.D. Pa. Jan. 13, 2003); United States v. Veksler, 62 F.3d 544, 548 (3d Cir. 1995).

In this case, the prosecutor has not violated Pennsylvania's ethics rules because Rule 4.2 "specifically makes an exception for those contacts which are 'authorized by law.'"  Grass, 239 F. Supp.2d at 541 (quoting Rule 4.2).  The Third Circuit has held that "pre-indictment investigation by prosecutors is precisely the type of contact exempted from the Rule as 'authorized by law.'"  United States v. Balter, 91 F.3d 427, 436 (3d Cir. 1996).

Other circuits have also held that the no-contact rule is not violated when undercover agents have conversations with represented parties, pre-indictment, in non-custodial settings in the course of criminal investigations.  United States v. Ryans, 903 F.2d 731, 739 (10th Cir. 1990) (the no-contact rule "was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel"); United States v. Lemonakis, 485 F.2d 941, 956 (D.C. Cir. 1973) ("in the investigatory stage of the case, the contours of the 'subject matter of the representation' by

appellants' attorneys, concerning which the code bars 'communication,' were less certain and thus even less susceptible to the damage of 'artful' legal questions the Code provisions appear designed in part to avoid"); United States v. Dobbs, 711 F.2d 84, 86 (8th Cir. 1983) (the no-contact rule "does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously had retained counsel").

**B. The government did not violate Mr. Karoly's Fifth Amendment rights.**

Mr. Karoly argues his Fifth Amendment rights were violated when the government "directly and surreptitiously interrogated Karoly when it knew for 17 months that he was represented by counsel and would not submit to such questioning." Def. Mot. at 16.

The Fifth Amendment protects a person from compelled self-incrimination. See U.S. Const. amend. V; Fisher v. United States, 425 U.S. 391, 409 (1976). Additionally, when a suspect is in custody, procedural safeguards, i.e. Miranda warnings, are required to protect a suspect's Fifth Amendment rights. United States v. Mesa, 638 F.2d 582, 584 (3d Cir.1980) ("Miranda warnings are designed to protect against the evils of 'custodial interrogation'"). Mr. Karoly fails to establish how the video-taped conversation with Mr. Mendelson constituted a custodial setting to support a Fifth Amendment violation. He also fails to show that the conversation was compelled or even incriminating.

Even if the conversation was compelled and incriminating, there is still no Fifth Amendment violation where, as here, the government has represented that it will not use

the interview statements at trial nor call its undercover agent.  Violations of the Fifth

Amendment occur only at trial.  United States v. Verdugo-Urquidez, 494 U.S. 259, 264

(1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a

fundamental trial right of criminal defendants. Although conduct by law enforcement

officials prior to trial may ultimately impair that right, a constitutional violation occurs

only at trial") (internal citations omitted).  In Chavez v. Martinez, 538 U.S. 760, 767

(2003), the Supreme Court stated that the defendant "was never made to be a 'witness'

against himself in violation of the Fifth Amendment's Self-Incrimination Clause because

his statements were never admitted as testimony against him in a criminal case.  Nor was

he ever placed under oath and exposed to 'the cruel trilemma of self-accusation, perjury

or contempt.'" (internal citations and quotations omitted).

**1. The interview was not in a custodial setting**.

Mr. Karoly was certainly not "in custody" during the conversation with Mark

Mendelson.  Miranda warnings are required in order to protect a suspect's Fifth

Amendment right against self-incrimination only where the suspect is subjected to

"custodial interrogation."  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also, e.g.,

Oregon v. Mathiason, 429 U.S. 492, 494 (1977).  For Fifth Amendment purposes, a

suspect is in custody if a "reasonable person" in the suspect's position would not feel free

"to terminate the interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112

(1995); United States v. Bazemore, 77 F.App'x. 110, 112 (3d Cir. 2003).  "In other words,

7

courts should apply an objective test and find that a suspect is in custody where there has been a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Id. at 113 (citing California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (internal citations and quotations omitted).

Mr. Karoly's pre-indictment interview with the government's "agent" was not a custodial interview.  Mr. Karoly drove from his Lehigh Valley law office to the Villanova home of Mr. Mendelson by himself, in his own vehicle, on a day and time he selected. Mr. Mendelson was his client.  Mr. Karoly was free to leave at any time and eventually did leave of his own accord after sitting down to talk and eat with Mr. Mendelson. Because this interview was not in a custodial setting, the requirement of procedural safeguards before using statements from a criminal defendant was not triggered.  See Miranda, 384 U.S. at 444 (holding that procedural safeguards are necessary to use statements obtained from a criminal defendant during custodial interrogation).  Mr. Karoly fails to present any arguments to the contrary.

## 2. Mr. Karoly's "statements" were not compelled.

Mr. Karoly enjoys a reputation as a successful criminal defense attorney.[3]  Mr.

---

[3]Kevin Amerman, Jury acquits 2 men of murder, The Morning Call, Apr. 25, 2009, at B1 ("Following a nine-day trial, a Lehigh County jury needed only about an hour Friday to acquit two men of murder . . . After the 12-member jury announced its verdict . . . Jarrett of Easton hugged his lawyer, John P. Karoly, Jr"); Brian Callaway and Arlene Martinez, Charges dropped in Austin Scott rape case," The Morning Call, Apr. 19, 2008 (stating that Scott's defense attorney, John P. Karoly, Jr. has also "won multimillion dollar settlements in brutality and misconduct suits against the Bethlehem and Easton police departments"); Elliot Grossman, Cocaine case is dismissed by judge, The Morning Call, Apr. 24, 2005, at B11 (stating that a

Karoly well knew that he was free to discuss the case with whomever he chose and that

he had a right not to be compelled to do so.  There is no evidence of compulsion to

participate in this meeting, so it would be difficult to find that Mr. Karoly was compelled

to incriminate himself.  See Hoffa v. United States, 385 U.S. 293, 304 (1966) ("a

necessary element of compulsory self-incrimination is some kind of compulsion").

**3. Mr. Karoly made no inculpatory statements**.

Mr. Karoly did not say anything incriminating during his interview with Mr.

Mendelson.  His statements were largely self-serving, exculpatory and explained his

defense to the anticipated charges.  The dubious utility (to the government) of the

"statements" may perhaps be best evidenced by the government's statement during the

pretrial motions hearing that it will not use the interview or call Mendelson as a witness at

trial.  The "brief sampling" of the conversation with Mr. Mendelson provided in Mr.

Karoly's own memorandum on this issue supports that he "laid out his innocence" and did

not incriminate himself.  In fact, Mr. Karoly's statements are so self-serving that one

might suspect he knew he was being recorded.  He spoke of his own innocence and of his

son's lack of involvement.  Frankly, none of the "defense strategy" talk would have been

surprising to anyone familiar with the case, with the possible exception of the several

---

"federal judge has dismissed the cocaine case of a Phillipsburg man after the defense raised
questions about whether a key witness would identify the defendant"); Debbie Garlicki, James
Cortez is overwhelmed by not guilty verdict, The Morning Call, Nov. 4, 2005, at B2;
Tyra Braden, Gun charges are dropped against Easton man, The Morning Call, Feb. 26, 2005, at
B4.

comments regarding "contributions" to key lead political figures as a way of ending this prosecution. These comments introduced a certain sleazy quality into the discourse but were in no way a discussion of "defense strategy." Further, there was little, if any, information from the interview that the government did not already know from the public proceedings and filings in the civil will contest in Northampton County. There is no need to protect a criminal defendant from improperly compelled, incriminating statements if the statements themselves are not incriminating and not the least bit compelled. Additionally, Mr. Karoly's rights were not violated when the government heard "defense strategy" in this conversation when, in fact, this information had already been provided in other contexts.

**4. There was no prosecutorial misconduct.**

There has been no violation of the no-contact rule. Mr. Karoly raises the concern that the AUSA prosecuting this case will have to testify because he was present for witness interviews with the FBI case agent. However, AUSA Weber has represented he will not vouch for his witnesses. See Order dated May 7, 2009 (stating that counsel for the government has represented that he will not interject his presence at witness interviews into any portion of the trial in satisfaction of United States v. Vitillo, 490 F.3d 314 (3d Cir. 2007)).

**5. The selective prosecution argument has no merit.**

There is no evidence that the government selectively prosecuted the defendants by

10

failing to pursue criminal cases against other members of John Karoly's family.  To establish a claim of selective prosecution, Mr. Karoly bears the burden of proof of both: (1) providing "evidence that persons similarly situated have not been prosecuted" and (2) showing "that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or that the prosecution was intended to prevent his exercise of a fundamental right."  United States v. Schoolcraft, 879 F.2d 64, 68-69 (3d Cir. 1989) (internal citations omitted).

        While Mr. Karoly has argued that the government failed to pursue an investigation into whether his sisters embezzled from Peter Karoly and that the United States' Attorney has failed to prosecute such behavior, the government asserts that it investigated the allegations and determined that the claims had no merit.  Prosecutors have broad discretion to bring and conduct criminal prosecutions and these decisions are "particularly ill-suited to judicial review" except as to constitutional issues.  United States v. Armstrong, 517 U.S. 456, 464 (1996).  Here, Mr. Karoly has not alleged a claim of bias based on impermissible, discriminatory standards or egregious misconduct sufficient to trigger constitutional protections.  Id.

## 6. The government's presentations to the grand jury did not prejudice any defendants.

        Mr. Karoly contends that the government abused the grand jury process by subpoenaing witnesses and "targets" it knew would invoke privileges.  Specifically, he refers to subpoenas issued to Mrs. Rebecca Karoly (John. P. Karoly's wife), J.P. Karoly

11

and Dr. Shane.  There were two grand juries in this case. The first grand jury returned an indictment that was filed on September 25, 2008; the second grand jury returned the superseding indictment that was filed on March 12, 2009.

Although originally subpoenaed, Mrs. Rebecca Karoly was not required to assert spousal immunity in front of either grand jury.  AUSA Seth Weber's statement that he initially would not accept Mr. Goldman's assertion of her spousal privilege because he thought Mr. Goldman had a potential conflict of interest in representing her, Gov't Mem. at 14, 15, is not relevant now.  Mr. Weber eventually agreed not to require her appearance at either of the two grand juries, mooting this issue id.

J.P. Karoly and Dr. Shane were subpoenaed to testify before the first grand jury in spite of the fact that AUSA Weber knew they would exercise their Fifth Amendment rights to remain silent.  Def. Mem. at 11.  Although he was subpoenaed, J.P. Karoly was never actually called before the grand jury.  Gov't Mem. at 17.  The government concedes that subpoenaing a target of an investigation when one knows he will exercise his Fifth Amendment right not to testify is not desirable.  See Gov't. Mem. at 15; U.S. Attorney's Manual, 9-11.154.  Yet, there is no prejudice arising from J.P. Karoly's being subpoenaed where he never actually took the stand and was not put in a position to invoke the privilege.

Dr. Shane, a target of the investigation, was subpoenaed by the government, took the stand and exercised his Fifth Amendment privilege before the first grand jury.  Gov't.

12

Mem. at 17.  Before Dr. Shane asserted the privilege, AUSA Weber asked him a series of questions about Peter Karoly's will.  Id.  Dr. Shane asserted the privilege more than once. Id.  Eventually, AUSA Weber ceased questioning Dr. Shane and excused him.  Id.

The jury may not draw any inference from a witness' decision to exercise his Fifth Amendment privilege, regardless of whether the inference is favorable to him or to the government.  See, e.g., United States v. Reed, 173 F.App'x. 184, 189 (3d Cir. 2006) ("allowing a witness to testify for the purpose of invoking the Fifth Amendment 'would only invite the jury to make an improper inference'")(quoting Bowles v. United States, 439 F.2d 536, 541-42 (D.C. Cir. 1970)).  Nevertheless, a "jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.'  In reality the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination."  Bowles, 439 F.2d at 541-42 (citing Fletcher v. United States, 332 F.2d 724 (D.C. Cir. 1964)).  For this reason, a witness should not be placed on the stand for the purpose of having him exercise his Fifth Amendment privilege before the jury.  See, e.g., Morrison v. United States, 439 F.2d 536 (D.C. Cir. 1970) ("This would only invite the jury to make an improper inference.  For the same reason no valid purpose can be served by informing the jury that a witness has chosen to exercise his constitutional privilege.  That fact is not one the jury is entitled to rely on in reaching its verdict"); United States v. Duran, 884 F. Supp. 573, 574-75 (D.C. Cir. 1995) (a

13

witness should not be called for the purpose of having him exercise his privilege before the jury because this would invite the jury to make an improper inference); <u>San Fratello v. United States</u>, 340 F.2d 560, 565-68 (5th Cir. 1965) (finding reversible error in permitting the government to call witness so as to require her to claim Fifth Amendment privilege in the presence of the jury); <u>United States v. Victor</u>, 973 F.2d 975, 979 (1st Cir. 1992) (a witness' refusal to answer a question in cross-examination could lead a jury to draw impermissible inferences); <u>United States v. Vandetti</u>, 623 F.2d 1144, 1148 (6th Cir. 1980) (the government has no right to benefit from any inferences that the jury may draw from the witness' assertion of the privilege "alone or in conjunction with questions that have been put to him").

AUSA Weber's decision to call Dr. Shane before the first grand jury, requiring that he invoke the Fifth Amendment while on the stand, was not a violation of Dr. Shane's constitutional rights.  In <u>United States v. Addonizio</u>, 313 F. Supp. 486, 495 (D. N.J. 1970), a district court in New Jersey was asked to dismiss an indictment because while "targets of the grand jury investigation [the defendants] were, nonetheless, compelled to appear and thereby required, to their prejudice, to invoke their Fifth Amendment privilege against self-incrimination."  The district court stated that "[c]learly, a target or prospective defendant can be compelled to appear before a grand jury even when such a defendant makes it known to the prosecuting authority that he intends to rely upon the Fifth Amendment. Such circumstances provide no basis for the dismissal of an

14

indictment," id. (citing United States v. Wolfson, 405 F.2d 779, 784 (2d Cir. 1968)).  To call a witness who almost certainly will invoke his Fifth Amendment right is definitely problematic, but not illegal and no basis to dismiss the indictment.  In any event, the issue is moot because the first indictment was superseded.

There is no prejudice resulting from Dr. Shane's invoking his Fifth Amendment privilege before the first grand jury because the superseding indictment was returned by a completely different grand jury before which he was never called.  Gov't. Mem at 17. Any taint from putting Dr. Shane on the stand in front of the grand jury was remedied.

There is no reason to dismiss this indictment.  A court may dismiss an indictment based on error in the grand jury only "'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations.  Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988) (internal citations omitted).  There has been no proof that the grand jury's decision to indict was substantially influenced by any improper practices or improper evidence.

**C. There was no Sixth Amendment violation**.

Mr. Karoly claims that his Sixth Amendment rights were violated when AUSA Weber videotaped Mr. Karoly's conversation with Mr. Mendelson.  However, as that interview took place before adversarial proceedings were initiated, the interview does not fall within the scope of the Sixth Amendment right to counsel.  United States v. Henry,

447 U.S. 264, 269 (1980) (holding that the right to counsel attaches when "critical stages of the prosecution" are initiated).

To prohibit investigatory contacts pre-indictment of "any person known to be represented by counsel in any way whatsoever, will insulate from undercover investigation any defendant with enough financial resources to permanently obtain private counsel." Grass, 239 F. Supp.2d at 545.  The practical implications of such a rule should be obvious:  it "would dramatically impugn the integrity of the judiciary; not to mention the crippling effect it would have on the Government's ability to investigate on-going criminal activity."  Id. at 545-46.[4]

In Rothgery v. Gillespie County, Texas, 128 S.Ct. 2578, 2581 (2008), the Supreme Court reaffirmed its longstanding Sixth Amendment rule that "the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty."  In other words, the right does not attach "until a prosecution is commenced." Id.  See also McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); Moran v. Burbine, 475 U.S. 412, 430 (1986); Brewer v. Williams, 430 U.S. 387 (1977).  There may

---

[4]Although it applied New Jersey's professional responsibility rules, the Third Circuit's decision in United States v. Balter, 91 F.3d 427 (3d Cir. 1996) is instructive.  In Balter, the Third Circuit considered a defendant's challenge to a tape recording of his conversation with a cooperating witness while he was represented by counsel but before he was indicted.  Id. at 435. The court stated that "prohibiting prosecutors from investigating an unindicted suspect who has retained counsel would serve only to insulate certain classes of suspects from ordinary pre-indictment investigation" and "would significantly hamper legitimate law enforcement operations by making it very difficult to investigate certain individuals.  Id. at 436.

be circumstances in which exception to this established principle should be taken, but this case does not present such circumstances.

In <u>United States v. Levy</u>, 577 F.2d 200 (3d Cir. 1978), the Third Circuit reviewed a criminal case in which the defendant's attorney represented a cooperating co-defendant who revealed the defendants' strategy to the government.  This case is similar in that a revelation of defense strategy is alleged, but in <u>Levy</u>, the confidential attorney-client information that was provided to the government was learned by a government agent actually participating in private, privileged discussions between the defendant and his attorney. <u>Id.</u> at 210. Those are not the facts in this case.  Here, Mr. Karoly voluntarily met with Mr. Mendelson and revealed his own plan to defend himself.  Most of those defenses were not new revelations; rather, they had been set forth in the civil will contest case in Northampton County and were publicly known facts.  Further, in <u>Levy</u>, the government's meeting with the informant occurred <u>post</u>-indictment. <u>Id.</u> at 203-04.  The defendant's Sixth Amendment right to counsel had already attached.

The defendants cite several other cases (not controlling) to suggest that the right to counsel may exist before adversarial proceedings commence formally.  Def. Mot. at 20.  For example, <u>United States v. Rosen</u>, 487 F. Supp.2d 721, 732 (E.D. Va. 2007) involved the government pressuring the defendants' employer to terminate them and cease advancing attorney's fees.  Even with those egregious facts, the court did not find a Fifth

or Sixth Amendment violation.[5]

The <u>Rosen</u> case quotes <u>United States v. Larkin</u>, 978 F.2d 964, 969 (7th Cir. 1992) in which the Seventh Circuit stated that a "defendant may rebut [the] presumption [that the right to counsel only attaches at indictment] by proving the government, prior to indictment, crossed the 'constitutionally significant divide from fact finder to adversary'," <u>Rosen</u>, 487 F. Supp.2d at 732.  <u>Larkin</u> involved many prosecutorial errors which rendered the government's conduct adversarial rather than investigatory. <u>Larkin</u>, 978 F.2d at 967-68.  In <u>Larkin</u>, the defendants were served with a writ[6] for a line-up while in custody, but before they were indicted. <u>Id.</u>  The court stated, in dicta, that the government should "make every effort to provide counsel to custodial defendants appearing in pre-indictment line-ups," <u>id.</u>, at 969.  This statement does not get Mr. Karoly very far.  The <u>Larkin</u> court did not find that the government had crossed a constitutional line.  <u>Id.</u>  In fact, the court did not even suggest that its reasoning would apply to investigatory stages other than line-ups, such as pre-indictment recorded interviews.

The cases defendants cite differ significantly from this case.  Here, Mr. Karoly, an experienced criminal defense attorney, voluntarily met with a government agent and

_____

[5]Similarly, the facts in <u>United States v. Stein</u>, 435 F. Supp.2d 330 (S.D. N.Y. 2006), involved government interference with defendants' employer and the employer's payment of defendants' counsel fees.

[6]The Seventh Circuit determined that it was error even for the writ to be issued because it was the wrong type of writ and the grand jury had not yet ordered the defendants to participate in a line-up.

discussed the charges he believed might be filed against him.  The government certainly may have timed the issuance of the indictment so that the Mr. Mendelson interview with Mr. Karoly could occur prior to the attachment of his Sixth Amendment right.  This action however, does not rise to the level of rendering the government an "adversary" rather than "fact-finder," <u>Rosen</u>, 487 F. Supp.2d at 732.  Any other rule would impermissibly handicap law enforcement and is not supported by the caselaw.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss will be denied.

An appropriate Order follows.