# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal Case No. 08-592-01** |
| | : | |
| v. | : | |
| | : | |
| JOHN P. KAROLY, JR. | : | |

## DEFENDANT KAROLY'S SENTENCING MEMORANDUM

Defendant John P. Karoly, Jr., will appear before this Court on May 5, 2010 for

sentencing. This memorandum in aid of sentencing is respectfully submitted through his counsel.

**I.      Preliminary Statement**

On July 6, 2009, Mr. Karoly entered a guilty plea before this Court to filing false income

tax returns for the years 2002, 2004 and 2005. Following a bench trial, Mr. Karoly was adjudged

guilty of mail fraud and money laundering offenses arising from his efforts to recover a $500,000

charitable contribution that he had made to the Lehigh Valley Community Foundation. Mr.

Karoly had taken a charitable deduction on his 2004 tax return for that contribution. And now,

as a result of these tax-based offenses, a 35-year practicing attorney who prided himself in

representing the common man, will stand in federal court as the focus of this Court's good

judgment and discretion. For any attorney in this situation, life as he presently knows it will

come to an end. Publicly humiliated and disgraced he will stand as a convicted felon with the

loss of rights that follow that status. He will lose his right to practice law which is at the very

core of his being.[1] He will lose his earning capacity and his ability to support his wife of over 32

years. He will be obligated to pay to IRS millions of dollars in back taxes. Even prior to the

---

[1] On April 30, 2010 Mr. Karoly and counsel for the Disciplinary Board for the PA Supreme Court filed a
Joint Petition for Temporary Suspension of the law license of John P. Karoly, Jr. We are awaiting action by the
Supreme Court.

imposition of final sentence, there is not a soul who would trade his place with the position of John Karoly.

It is clear to any practitioner of white collar criminal law that even good people commit criminal acts and that there is more substance to almost any man than simply being broadly and conclusively defined by the wrong acts that bring them into public rebuke. Sixty years of age with significant health issues, Karoly appears before this Court simply requesting that the Court recognize that the offenses of conviction do not define the man that Karoly is and do not erase the good efforts he has contributed throughout his life to assist others and, simply request the Court to appreciate the hefty punishment that has already been afflicted upon himself and his family. In the world of federal sentencing post-<u>Booker</u>, this Court is faced with the duty to craft a sufficient sentence that is not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

II.    **The Applicable Sentencing Standard**

Following the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005), a sentencing court must impose a sentence after giving meaningful consideration to the factors contained in 18 U.S.C. § 3553(a). *United States v. Cooper,* 437 F.3d 324, 329 (3d Cir. 2006). The Sentencing Guidelines that were once mandatory are now advisory and the properly calculated sentencing guideline range is now **but one factor** in the Court's sentencing determination. The Third Circuit has articulated the steps that the sentencing court must go through at sentencing.

> A district court must begin the process by first calculating the applicable Guidelines range. After that initial calculation, the court must then rule on any motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation. Finally, after allowing the parties an opportunity for argument, the court must consider all of the § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines.

2

*United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009). Section 3553(a) mandates that a district court must "impose a sentence sufficient but not greater than necessary" to comply with the purpose of sentencing set forth in 18 U.S.C. § 3553(a)(2). The Third Circuit has interpreted the statute as requiring the imposition of a sentence which is "minimally sufficient" to achieve the stated purposes of sentencing. *United States v. Serafini*, 233 F.3d 758, 776 (3d Cir. 2000). *See also United States v. Tucker*, 473 F.3d 556,561 (4th Cir. 2007); *United States v. Forman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). The purposes of sentencing include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". 18 U.S.C. § 3553(a)(2)(A),(B),(C) and (D).

The courts must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; the Sentencing Guidelines; and "the need to provide restitution to any victims of the offense". 18 U.S.C. § 3553(a)(1), (3), (4) and (7).

III.    **Sentencing Guidelines Issues**

Karoly stands convicted of offenses relating to filing false tax returns for calendar years 2002, 2004 and 2005 and mail fraud and money laundering offenses related to his taking back in 2007 the $500,000 charitable contribution he had made to the Lehigh Valley Community Foundation in 2004. In its Change of Plea Memorandum and in tax loss calculations, the government asserted that Karoly's fraudulent conversion of the $500,000 charitable contribution and deduction taken in tax year 2004 was part and parcel of his tax fraud and false income tax

3

filings. The money laundering and mail fraud counts, according to the government, was Karoly's "execution of a scheme he had devised to make a charitable deduction, and then get the money back to himself for his own use and benefit." Gov. Tr. Mem at 6. The government argued that Karoly "made a donation to charity with the specific intent that he would defraud the charity and be able to recover, that is, get back all of the money he donated to the charity, and use it for personal and business uses." Id. at 32. Karoly "continued his scheme to recover his monies on a tax free basis." Id. at 35. As the government acknowledged, "to be sure, defendant has already pled guilty to counts 2 and 3 of the superseding indictment which charges the willful filing of false income tax returns for calendar years 2004 and 2005. The underlying facts which supported the basis of these guilty pleas included, but was not limited to, the fraudulent charitable deductions of $500,000 to LVCH ..." Id. at fn.5 at 31.

The money contributed to LVCF was taken as a tax deduction by Karoly in 2004. It is therefore used by the government in calculating the sentencing guidelines for the tax offenses (see Government's Tax Loss Memorandum) and also used in calculating the fraud/money laundering guidelines. See PSR ¶¶ 30, 31, 98 and 106. The PSR at ¶ 70 recognizes the fact that the mail fraud and money laundering acts "were necessary in order for Mr. Karoly to carry out his scheme to recapture his 2004 tax deduction . . . and to use the funds for his own purposes, not for legitimate, tax exempt purposes."

### A. The Grouping of Counts of Conviction

It is the position of the defense that all of the counts of conviction should be grouped together into a single Group in accordance with §3D1.2(d) of the Sentencing Guidelines. Section 3D1.2 provides that closely related counts shall be grouped for purposes of calculating the total

offense level. Counts are closely related if they involve "substantially the same harm," which exists:

>    (a) When counts involve the same victim and the same act or transaction.
>
>    (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
>    (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>
>    (d) **When the offense level is determined largely on the basis of the total amount of harm or loss,** the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
>    U.S.S.G. 3D1.2 (emphasis added)

In *United States v. Astorri*, 923 F.2d 1052 (3d Cir. 1991) and *United States v. Vitale*, 159 F.3d 810 (3d Cir. 1998), cited by the probation office and government, the Third Circuit declined to group tax and fraud counts under a Section 3D1.2(c) analysis. The government therefore broadly concludes that tax counts may not be grouped with fraud/money laundering offenses where separate victims exist. This conclusion is error and refuted by courts in this circuit and others.

In *United States v. Corbett*, 44 Fed.Appx. 563, 568 (3d Cir. 2002), the Third Circuit recognized that tax and fraud counts may be properly grouped under 3D1.2(d). The Court specifically held that *Astorri* and *Vitale* were decided under a 3D1.2(c) analysis and therefore remanded the case for a resentencing hearing to consider the issue of grouping under 3D1.2(d). Prior to the *Corbett* decision, the Fifth Circuit highlighted the narrow holding of *Astorri* stating that it focused solely on a 3D1.2(c) claim by the defendant. In *United States v. Haltom*, 113 F. 3d 43 (5th Cir. 1997), the Court distinguished the facts of *Astorri*.

5

"The conduct underlying Haltom's mail fraud conviction was counted twice toward his sentence, once as the basis for his mail fraud offense level and again a specific offense characteristic of the tax evasion counts. This double-counting actually lengthened Haltom's sentence: the enhanced tax evasion count was directly responsible for the ultimate 2-level increase in his total offense level for mail fraud . . . The purpose of section 3D1.2 is to prevent precisely this sort of " 'double counting' of offense behavior." U.S.S.G. § 3D1.2, Commentary, Application Note 5. . . . . In contrast, there is no indication in the Third Circuit's opinion that Astorri was the victim of impermissible double-counting. To the contrary, the opinion strongly implies that there was none. Astorri had received an offense level of 19 for fraud and 15 for tax evasion. Applying the formula in section 3D1.4, the district court added 2 levels to the offense level for fraud to reflect the additional harm caused by Astorri's tax evasion. Astorri, 923 F.2d at 1057. However, the published opinion contains no hint that Astorri's tax evasion had already been enhanced to reflect the conduct underlying the fraud count. The sentence affirmed in Astorri was based on a district judge's determination to enhance the sentence 2 levels, based on either the specific offense characteristic for tax evasion or under the formula in section 3D1.4. The district judge did not attempt to increase Astorri's sentence twice based on the same conduct. . . . However, the guidelines clearly forbid the alternative approach taken by the district court: using the mail fraud count to enhance the offense level for tax evasion and then using the enhanced tax evasion offense level to increase the offense level for mail fraud. The district court, believing itself bound by Astorri, imposed too harsh a penalty by double-counting the conduct underlying Haltom's mail fraud conviction."

Id. at 47; See also *United States v. Dougherty*, 2009-1 U.S. Tax Cas. (CCH) P50159 (E.D. Pa. 2008)(tax and fraud counts properly grouped under 3D1.2(d*)); United States v. Fitzgerald,* 232 F.3d 315, 319 (2d Cir. 2000)(grouping tax, fraud and conversion charges under 3D1.2(d)).

In addition, as referenced in the *Haltom* decision, after the Third Circuit decided *Astorri,* the Sentencing Commission issued an advisory stating that tax evasion should always be grouped with the offense that generated the illegal income--regardless of whether the 2-level increase for criminally derived income was actually applied. See Questions Most Frequently Asked About the Sentencing Guidelines, Vol. V, March 1, 1992 (construing U.S.S.G. §§ 3D1.2(c), 2T1.1(b)(1)).

In the instant case as determined by this Court, the goal of Karoly was to get the benefit of a charitable tax deduction and then recoup the money on a tax free basis. The fraud against

LVCF and Dubbs Church were part of his overall scheme to commit a tax fraud. Clearly, therefore, the government uses the $500,000 charitable contribution and fraud to get the tax loss over one million dollars to enhance the sentencing guideline for tax fraud. It is again used by the government to add 14 levels to the fraud/money laundering guideline. By not combining the tax and fraud offenses, the government gets to double dip using the $500,000 contribution and improperly enhancing Karoly's sentencing guideline range.

## B. Sophisticated Money Laundering

Evidencing the government's scorched earth attack at Mr. Karoly, it is argued by the prosecution that the defendant was engaged in "sophisticated money laundering" in his recovery of the charitable contribution made to LVCF. Such a claim is baseless and a misapplication of a Guideline enhancement that is reserved for the most appropriate cases.

Section 2S1.1(b)(3) of the Guidelines provides a two-level increase if an offense involved "sophisticated laundering." The guidelines commentary explains that sophisticated laundering "means **complex or intricate offense conduct** pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense," and it typically involves the use of "fictitious entities," "shell corporations," "two or more levels (i.e. layering) of transactions," or "offshore financial accounts." U.S.S.G. § 2S1.1, comment. (n.5(A))(emphasis added) .

The PSR and government memorandum ignore the first prong of the section that requires a showing of a complex or intricate offense conduct pertaining to the execution or concealment of the money laundering offense. The facts of the present case show the simplicity of Karoly's actions. In advance of the monetary transactions that form the basis for the money laundering convictions Karoly advised Dubbs UCC in advance of the receipt of the LVCF funds that the money was coming, that only a specified amount would be donated to Dubbs and that the

balance would be forwarded by Dubbs on to Karoly and Urban Wilderness. In addition, Karoly discussed the intended transactions in advance with his tax preparer/CPA who assisted in making the February 2007 transfer. The simplicity of Mr. Karoly's acts are self evident. If the enhancement is applicable to Mr. Karoly, it is difficult to imagine its inapplicability to any money laundering offense.

This case does not have the layering of transactions that are discussed in case law supporting the suggested enhancement. The PSR and government hang their hats on the simple argument that Urban Wilderness Foundation (UWF) was a fictitious entity, relying on UWF's failure to obtain 501(c) non-profit status. However, non-profit 501(c) status is relevant only to the issue of whether an entity has tax exempt status. Failure to be so designated does not render the entity to be bogus. Mr. Karoly retained an attorney, Donald LaBarre to incorporate Urban Wilderness. Karoly opened a bank account in its name and through his CPA secured a non-profit federal tax I.D. number and filed income tax return extension requests which were granted by the IRS. In all of these filings Karoly openly used his name as an officer and his law office address as the address for Urban. In his dealings with others he was open about his connections to Urban Wilderness. (Tr. 9/15/09 at 157-8, 189). Mr. Karoly's affiliation with UWF was publicly and resoundly disclosed to the world. LVCF was advised that UWF had been created by Mr. Karoly and that it was his goal that it accomplish charitable acts to assist others. In fact, UWF made charitable donations to 501(c) entities Pennsylvania Golden Gloves, the Cadet Severo Run, Camelot House, Game Conservancy USA and Dubbs UCC. See Government Exh. 91.

Mr. Karoly made no effort to conceal his relationship to the UWF and, at every turn, publicized his affiliation. In each instance where a filing or communication could easily have

been made to conceal Mr. Karoly's affiliation with the UWF, he did exactly the opposite. Some prominent examples in the record before this Court include, inter alia, the following:

> Lafayette Ambassador Bank - money market checking account with John P. Karoly, Jr. as President of Urban Wilderness Foundation and its only authorized signatory and, indicating his law offices as the UWF's address. See Government Exhibit 59(a) - a bank form indicating the above;

> Certified copy of Corporation Resolution signed by John P. Karoly, Jr. As President of the Urban Wilderness Foundation. See Government Exhibit 59(b);

> Form SS-4 - Application for Employer I.D. No. Filed with the IRS by Al France on 12/27/06 designating John P. Karoly, Jr., as the principal corporate officer of the private foundation known as the UWF, utilizing his law office address and his social security number. See Government Exhibit 59(b);

> Pa. Articles / Incorporation for non-profit entity - Urban Wilderness Foundation - identifies John P. Karoly, Jr. as the Incorporator, at his law office address, filed by LaBarre, with the Departments of both State and Revenue. See Government Exhibit 59(b);

> Urban Wilderness Foundation Bank Statement, 1/31/06, at Lafayette Ambassador Bank - Account is entitled "money market - non-profit". The Urban Wilderness Bank Statement reflects that Mr. Karoly openly established the UWF account at the very same bank that he had all his personal accounts; where he had his law offices accounts; and where his wife and children's accounts were located.
> - The account was opened by Mr. Karoly with his name as the subscriber and with the same address as each of his law office accounts maintained by the very same bank. These accounts existed for many years. There was no attempt to use a new bank, a different address than his law office accounts, or even a different location of the same bank nor did he ever identify any subscriber other than John P. Karoly, Jr. on the account. See Government Exhibit 59(c).

Prior to the transfer of the funds to Dubbs in February 2007, Karoly disclosed to Dubbs that the funds: were coming from LVCF; that a specific portion would be retained by Dubbs for their use; and that a specific portion would be used for funeral and catering expenses relating to services for Karoly's brother and sister-in-law and the remainder would be returned to Karoly and UWF. Dubbs agreed in advance of the transfers to this arrangement. (Tr. 9/24/09 at 47-48;

Exh. G-67a, 67b, 74). Karoly conducted the transfers openly to Dubbs and reduced the terms in writing to Dubbs. (Exh G-74). From an examination of these facts and the simplicity of the transactions it is remarkable that anyone would conclude that Mr. Karoly engaged in "**complex or intricate offense conduct** pertaining to the execution or concealment" of the offense as required for the sophisticated money laundering enhancement to apply. In fact, Pastor Brown advised the FBI that Brown "had never been asked by Karoly to hide from LVCF the true use of the funds received from LVCF." FBI 302 10/23/08 at 2.

Specifically, the evidence in the case before this Court is insufficient for the government to meet its burden of proving sophisticated money laundering. Karoly openly transferred funds from LVCF to Dubbs and subsequently openly transferred portions of the funds to entities involved in catering and funeral services and to Urban Wilderness. Prior to the transfer of funds from LVCF to Dubbs, Karoly received counsel from his CPA that the transactions were permissible and the CPA assisted Karoly in conducting the transfers. In advance, Karoly spoke with Dubbs representatives and openly discussed that the money was coming from LVCF (Tr. 9/15/09 at 148-9) and that Dubbs would only retain a portion of the funds transferred. (Tr. 9/14/09 at 205-207; 9/15/09 at 148-50). The balance would be returned by Dubbs to Karoly. (Tr. 9/14/09 at 206-7; 9/15/09 at 149). With this disclosure Karoly received the agreement of Dubbs to conduct the transactions. (Tr. 9/15/09 at 150). The money went directly from an LVCF account to Dubbs. A portion of the money went from Dubbs to Burkholder Funeral Home and Maison Blanc as agreed by Dubbs. In fact, Karoly also told these entities that payment from him would be through Dubbs. (Tr. 9/14/09 at 212; Exh. G-30). The transactions were open and not based upon any notion of concealment. The money that went from Dubbs to Urban Wilderness was also directly made. No intermediary bank accounts were used and Karoly left a bright trail

of the money to the bank account used which listed his office address as the address of Urban Wilderness. Moreover, depositing the money into bank accounts openly held in Urban Wilderness' name with an address at Karoly's law office refute the notion that Karoly acted in a complex manner to conceal the offense. The UWF bank account was not used to conceal money or its origins, but simply to be able to access it. Karoly was open about Urban Wilderness' affiliation with him. He incorporated it with the Pennsylvania Department of State using his office's address and listing himself as sole officer; he filed tax return extensions in its name with the IRS; he opened a bank account in its name with himself as signator and his office as the address; he discussed its connection to himself with the LVCF, his attorney and CPA.

## C. Abuse of Position of Trust

Section 3B1.3 of the Guidelines provides in pertinent part that if a defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. Abuse of a position of trust has specific Guidelines meaning: "the position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." *See*, U.S.S.G. § 3B1.3, Commentary, Application Note 1. The primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong. The commentary to section 3B1.3 provides substantial guidance as to the meaning of a "position of trust": "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Karoly did not hold such a relationship.

11

In *United States v. Pardo*, 25 F.3d 1187 (3d Cir. 1994), the Third Circuit cautioned that the district court "must consider: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position. These factors should be considered in light of the guiding rationale of the section--to punish "insiders" **who abuse their positions rather than those who take advantage of an available opportunity**." Id at 1192 (emphasis added).

The government's simple focus on the trust relationship between Mr. Karoly and Pastor Brown is not sufficient. This is recognized in the commentary to the enhancement. Moreover, there is a component of misplaced trust inherent in the concept of fraud. *United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir.1995). A sentencing court must be careful not to be "overly broad" in imposing the enhancement for abuse of a position of trust or "the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise" would receive a section 3B1.3 enhancement, *United States v. Moored*, 997 F.2d 139, 145 (6th Cir.1993). *See also United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996)("In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud."); *United States v. Boyle*, 10 F.3d 485, 489 (7th Cir.1993) ("Whether someone occupies a "position of trust' for purposes of § 3B1.3 does not turn on simple categories that might be used to characterize the relationship....Therefore, the sentencing court must look beyond descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given.").

By applying the factors discussed in *Pardo* it is evident that the suggested enhancement is not appropriate. Mr. Karoly's position as a church member and friend of the church do not

12

support a legal finding that he occupied a position of trust. First, Karoly's "position" as a friend and supporter of the church did not give him the ability to commit a difficult-to-detect wrong. There would have been nothing difficult to detect had LVCF made inquiry to Dubbs as to how the money was ultimately disbursed. At most, Karoly's position as a friend and supporter of the church allowed him the opportunity to commit an easily detectible wrong. This is simply not sufficient to warrant enhancement. Secondly, even more clearly lacking, as in *Pardo* is the requisite degree of authority over the object of his wrong. Mr. Karoly had no authority over anyone or anything necessary to the commission of the offenses. Again, as in *Pardo*, although Pastor Brown may have relied on Karoly's integrity, Karoly was not placed by the church in any position that gave him the wherewithal or authority to commit the fraud.

Reflecting on the rationale for the two-level enhancement, this Court must similarly reject the government's position. The Third Circuit has stated that "the rationale for increased punishment is that an *insider* who takes advantage of a position of trust to facilitate a crime is thought to be more culpable than one who simply commits the offense." *United States v. Craddock*, 993 F.2d 338, 340 (3d Cir. 1993)(emphasis added). Karoly was not an insider at Dubbs. Although he was a generous contributor to Dubbs, he was an outsider, a member of the congregation who lacked managerial or professional discretion as required by the enhancement. Karoly's past good works for the church cannot be used to bootstrap the government's desire to artificially enhance Mr. Karoly's Guideline range. It is the "position" of the person which is punished under 3B1.3 and not the good character trait "trust".

IV.    **Motions for Departure**

   A. **Departure From the Sentencing Guidelines: Outside the Heartland**

The commentary to U.S.S.G. § 1A1.1 provides that the "Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guidelines linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." It is submitted that the instant case merits this application. See *United States v. Smith*, 186 F.3d 290 (3d Cir. 1999). Smith held that under Appendix A to the Guidelines manual, a sentencing court must engage in a two-step inquiry before applying a particular guideline section. First, does the designated guideline apply or is the conduct 'atypical' in comparison to that usually punished by the same statute of conviction; and, secondly, if the conduct is 'atypical,' which guideline is more appropriate. Id.at 297. Atypical money laundering conduct is conduct outside the heartland of § 2S1.1. Id. at 297-98. When deciding whether to apply the guideline, a court must undertake a heartland analysis 'identical' to that employed when evaluating downward departures under U.S.S.G. Ch. 1, Pt. A, intro. comment. 4(b). Id. at 298.

Research of fraud and money laundering cases have failed to locate any fraud/money laundering case where a defendant is convicted of fraud offenses as a result of his taking back a charitable donation he made. The typical fraud case obviously involves the taking or converting of money belonging to another. In this case, LVCF had money provided by Karoly and LVCF lacked the discretion to disburse the funds to 501(c) entities without the approval of Mr. Karoly. Although, as found by the Court, Karoly could not take back the money without instituting legal action against LVCF, similarly LVCF lacked an agreement with Mr. Karoly to permit LVCF to have sole discretion in the money's disbursement.

14

The recouping of previously contributed funds is being used in this case to greatly increase the Sentencing Guideline range in this case. The tax guidelines are at a level 22 if the tax loss is determined to be in excess of one million dollars. Below one million dollars, the guideline level is 20. The fraud/money laundering guideline level is 23 without abuse of position of trust and sophisticated money laundering enhancements. If the tax and fraud/money laundering are not grouped, the fraud/money laundering guideline being applied in this atypical case enhances the sentencing guideline level to 25 before adding any other enhancement.

Since the purpose, as determined by the Court, of Mr. Karoly's acts was to get a charitable deduction and to later re-obtain the money for his personal use, a departure to the tax guidelines is appropriate in this case. Otherwise, a downward departure from the fraud/money laundering guideline is warranted.

In addition, the cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present "to a degree" not adequately considered by the Commission and therefore permits a sentencing judge to make a downward departure. *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003).

### B. Other Grounds for Departure

In accordance with U.S.S.G. § 5K2.0 and the Supreme Court's opinion in *United States v. Koon*, a court may depart from the Guidelines if it finds that mitigating factors, not otherwise prohibited by the Guidelines, are "present to an exceptional degree or in some other way make the case different from the ordinary case where the factor[s are] present. 518 U.S. 81, 96 (1996). In this case, mitigating factors include (1) Mr. Karoly's prior good works (*See United States v. Kuhn*, 351 F.Supp. 2d 696, 705-6 (E.D. Mich. 2005)(downward departure granted in part based

DTI 871029v1 05/03/10

on defendant's community involvement); *United States v, Rioux*, 97 F.3d 648, 663 (2d Cir.

1996)(downward departure based in part on defendant's charitable and civic good deeds); (2) the

collateral employment consequences, that is, loss of Karoly's professional license to practice law

(*See United States v. Jones*, 158 F.3d 492, 499 (10th Cir. 1998)(affirming downward departure

based in part on the collateral employment consequences that the defendant would suffer); and

(3) age and health issues (*See e.g. United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at

*4 (W.D. Ark.Feb.1, 2008); *Simon v. United States*, 361 F.Supp. 2d 35, 42-43 (E.D.N.Y. 2005).

These factors may form the grounds for departure when they are present to an exceptional

degree. *See Koon*, 518 U.S. at 96; U.S.S.G. § 5K2.0(a)(4). They may also in combination with

one another remove the case from the heartland of typical guideline cases. See § 5K2.0(c).

V.      **Mr. Karoly's Personal and Professional History**

John P. Karoly, Jr. was born on March 13, 1950, the oldest of six children born to Stella

Fischl Karoly and John P. Karoly, Sr. Neither of John's parents completed high school. His

mother left to work in a cigar factory to help support her family of nine and his father joined the

Merchant Marine to help support their 13 member family. Grandfather Fischl delivered blocks

of ice door to door from his ice truck and grandfather Karoly was a shoemaker. John P. Karoly,

Jr. was only the second member of either family to go to college and the first to get an advanced

degree of any kind.

When John Jr. was a young teenager, his father suffered a severe fall down a flight of

stairs while working as the head chef at Trainer's Restaurant in Quakertown. After several back

surgeries, he was told he would never walk again. He was denied workers compensation based

on an allegation by the insurance carrier that the injuries really stemmed from 20 year old back

damage he received in the service. After some six years of litigation Mr. John Karoly, Sr.

DTI 871029v1 05/03/10

prevailed on his award and the family finally received $42.50 per week in workers' compensation payments.

During these six years the Karoly family was dependent for survival almost exclusively (the government had a program in effect at the time where they provided canned meat and cheese for the family) upon John, Jr.'s. income from two newspaper routes, shoe-shining and snow shoveling and grass cutting that helped shape the man we know today. He had decided at the time that he would become a lawyer to try to help save other families from the trauma and poverty that his family had faced during these very trying times. John's seventh grade paper "I want to be a Lawyer (sic)" explained his motivation.

John's life as a young man was "school and work" and he worked hard at each. He was elected as President of The Key Club, the school's largest community service organization, as well as elected President of the Student Body. He won state, national and international oratorical awards as well as outstanding community service awards from the Optimist Club, The Veterans of Foreign Wars and The American Legion.

John received an academic scholarship, and a work study grant to attend Dickinson College in Carlisle, Pennsylvania. There, he held three jobs, a cook in the colleges kitchen, cafeteria security, and the person entrusted with the security for the entire gymnasium complex.

He was also elected by his fellow freshman as their representative to the Student Senate, the school's student government body. John was also a Varsity Swim Team member who advanced to the Middle Atlantic Swimming Championships and, he was selected to attend Dickinson's Center for International Studies in Bologna, Italy. He was chosen as a summer Congressional Intern by Congressman Fred B. Rooney and worked in Washington, D.C. John

DT1 871029v1 05/03/10

also was selected as a student Fellow at the Center for the Study of the Presidency, a conservative Presidential think tank located in New York City.

The lottery draft was in effect during John's college years. His lottery number was 258, meaning he would never be called. But, John wanted to serve his country if needed in Vietnam so he joined ROTC and was commissioned as a Second Lieutenant in the United Sates Army upon graduation.

John graduated <u>cum laude</u> from Dickinson College, an extremely difficult feat, especially considering all his work obligations and his having successfully completed what at that time was a rare double major in political science and history.

John was accepted into several law schools and chose Dickinson School of Law. He was the only student who held down a full time job in Harrisburg while attending Dickinson law School for three years. He was so advised by an unhappy Dean who said it couldn't be done. But, John proved him wrong by working as an assistant legal counsel in the law Bureau of he Public Utility Commission through his three years of law school.

Upon graduation from Law School, John entered the United States Army as a First Lieutenant and joined the infantry. After being qualified with a MOS (Military Occupational Specialty) as a Company Commander and completing his Active Duty requirements, he joined the Active Reserve and took a job as a law clerk to the late Judge Donald E. Wieand, who as a Common Pleas Judge prior to his elevation to the Superior Court. Mr. Karoly also wrote opinions for newly elected Judge David Mellenberg and Senior Judge Henry Schierer, at the time.

Upon completing his clerkship, Mr. Karoly opened a private office and became a part-time Public Defender and then Chief Appellate Counsel. He went on to serve as Solicitor the

18

Sherriff of Lehigh County and Special Counsel to Allentown City Council. He was also legal counsel for many associations including the Pennsylvania Law Officers Association and the Emmaus Police Association.

Mr. Karoly's distinguished career as an attorney is well-known and well documented with numerous public awards and, civil and criminal case verdicts and precedents.

Mr. Karoly has spent his last 35 years representing thousands of clients in both the civil and criminal arenas and, is perhaps best known for his successful representation of the poor and down trodden.

It is important to note that also among his clients are judges, doctors, lawyers, county commissioners, state senators, county executives and members of law enforcement.

In the history of the Allentown Office of the F.B.I., (the same office which is prosecuting him) two agents were arrested for crimes several years apart. They, of course had their right to select legal counsel from among hundreds of attorneys but, each chose to be represented by Attorney Karoly.

When Allentown City Council was faced with hearings involving Police Officer facing disciplinary charges, they likewise were free to choose any attorney. Allentown City Council chose Attorney Karoly.

When all the elected row officers in Lehigh County wished to challenge a statutory proviso limiting their compensation, they all hired Attorney Karoly to argue their case before the Pennsylvania Supreme Court.

When Karoly, a Democrat, believed that the Democratic Mayor of Allentown who he helped elect, thereafter demoted police officers for supporting his Republican opponent, Karoly successfully represented the police officers in a federal Section 1983 lawsuit resulting in the

restoration of their positions and substantial compensation. When asked by the media how he could take such a case, Karoly had a one word answer, "principle."

When an officer in the Easton Police Department shot and killed his fellow officer in police headquarters, the widow immediately retained Karoly because her husband always told her, "if anything ever happens to me, hire Attorney Karoly."

Mr. Karoly has been in numerous editions of Who's Who beginning with Who's Who in High School. He has been designated as one of Pennsylvania's Super Lawyers. And, even in the year of these criminal allegations, his firm was again chosen in 2007 as The Lehigh Valley's Leading Law Firm by Whose Who in Business in the Lehigh Valley based upon a poll of the citizens of the Lehigh Valley.

Mr. Karoly's dedication to the law is second only to dedication to family. He has a wonderful wife of 32 years who works full time as a Teachers Aid for challenged middle school students. He has two boys who are outstanding young attorneys who work with him, and three other attorneys, in his firm.

Growing up, Mr. Karoly coached each of his son's youth league sports, baseball, football and basketball and, assisted in his son Joshua's young wrestling career (two time league champion).

Mr. Karoly coached hundreds of his community's youth in these sports and further mentored many of them as a Cub Pack Master for several years.

The letters the Court has received include letters from Commissioner of the South Parkland Youth Association and numerous parents and now grown athletes who have commented on how Mr. Karoly went beyond good coaching and provided them with life lessons they continue to rely upon as teachers lawyers, healthcare providers, business executives, sports

agents, realtors, brokers, social workers, professional athletes and as members of our Armed Forces, to name a few.

Mr. Karoly and his family's philanthropy and dedication of time to their Church and various charities such as the Camelot House, Dream Come True, and Special Olympics, the Game Conservancy, Ducks Unlimited, The Cadet Severo 5K Run, and Pennsylvania Golden Gloves over his lifetime, he has been a major financial supporter of his extended family, including that of his now deceased Father.

Mr. Karoly is also a Regional Director of Pennsylvania Golden Gloves and USA Boxing, the groups that train and send our young Boxers to the Olympics. He was also honored by being admitted into the Boxing Hall of Fame. Pennsylvania is among the top states in the nation to produce Olympic medalists in boxing and, for several years, Mr. Karoly's donations have furnished our teams with their uniforms. Mr. Karoly has always espoused the belief that boxing, amateur and professional, is one of the best ways to help, especially inner city youth stay on the right side of the law and out of the dangerous gang environment which produces so much of today's crime. He has, for many years, sponsored the nation's largest amateur boxing event at SportsFest in Allentown – a two day event featuring amateur boxing with hundreds of participants from the Tri-State Area.

In summary, it is hard to find a man, much less a lawyer, whose life is so unselfishly dedicated to others and to the good of our society, as has been Mr. Karoly's. Consider also that the foregoing is but a glimpse of the true nature and character of the man standing before this Court.

The government's approach to evaluating the life of Mr. Karoly was simply and unprofessionally reduced to a ditty sung by the prosecutor at the bench trial. Dismissive of any

in depth analysis of the man, the prosecutor concluded that as to John Karoly, "life is but a scheme." The multitude of letters received from friends, clients and family members resoundly drown out the prosecutor's uncalled for anthem. One need only to reflect on the words of Navy Lieutenant Zach Butala who wrote: "I have led hundreds of men and women both on land and sea. I have never made a decision based on the hope of accolades; I make them based on the mission and the welfare of my sailors. I use the same qualities of leadership, mentorship, guidance, morals and values that I have learned from men like Mr. John Karoly. There is not a day that goes by where the men and women in uniform that I lead are not positively influenced by the same values Mr. Karoly taught me." Shane Patton also provided his insight: "because of what Mr. Karoly did for me at one of my greatest points of friction in my life; I was able to serve as a commissioned officer in the United States Marine Corps."

Other letters attribute strong accolades to Mr. Karoly: "trustworthy, honest, dedicated, hard working, law abiding father and family man that other men our age would find it difficult or almost impossible to match. . . a very generous man with both his time and money to help other people in time of need (Bruce Rothrock, Sr.); "an honest and forthright defender of what he believes to be right . . . to remove this good man from our midst would be taking away a singular but strong voice from many who have benefited from his wisdom and generosity" (Robert Mazziotta); "what is too often overlooked is the kind deeds he does with no expectation of recognition. . . tak[ing] those less fortunate under his wing. . . I have seen him literally provide clothes to those who do not have them or offer his best suit to a complete stranger simply because they needed it more than him" (Chris White); "you've only known JPK from a snapshot in time. I respectfully request, your honor, that you consider the full body of work in John

Karoly's existence" (Michael Luciano); "I have personally witnessed John's .... passion for the law and his determination to do what is morally and ethically right" (David Rothrock, Esq.); "John helps people out because he believes in what he does; he has a big heart, he is a good man, and a good friend" (Scott Clark); "He is loving and compassionate and he has touched so many lives" (Christine Maffuci); "his generosity with his time in assisting others and consulting those needing help have been examples I try to emulate and hope to teach my own daughters" (Joseph Jimenez); "To me there is no greater man with no greater qualities, heart, or character than Mr. John Karoly" (Mario Biundo); "Anyone who has the kind of schedule John does and still puts the needs of Family and Friends on a pedestal to be handled as his own has not only a special calling but also a special listening, vision, ministry, and agreeable spirit" (Barbara Paul); "I hope that one day that I can come close to his accomplishments not only in work but in every facet of life" (Brett George); "Since my father was not present in my life at that time, I looked up to Mr. Karoly is a way as a father-figure and idealized the relationship that he had with his sons. . . John has been a role model to me . . a positive presence in my life" (Michael Russ); "generous with his money and time in connection with various youth groups. . . please don't forget all of the good John has done for the community" (George Sam); "When I finished Marine Corps' boot camp, he was one of the first people to come and congratulate me for my accomplishment. When I returned from a tour in Iraq, he was also there to welcome me home and personally thank me for serving my country. I have always looked up to him and respected him. . . He has worked so hard for what he has attained and has done so much, not only for his family and friends, but also for the community" (Ryan George); "volunteered countless hours over many years to coach multiple youth sports" (Harry Kalvonjian); "He wards off the bullies and levels the field" (Victoria Hofman); "a pillar of the South Parkland Community" (Derek Jenkins); "time

consuming undertakings that John spearheaded . . . to promote sports and to provide quality family entertainment options in the Lehigh Valley" (Todd Lenhart); "paid our expenses – knowing we could never pay it back" (Sandra Moyer); "John has always been a hardworking, dedicated man who stood for the weaker and raised them up to get what was deserved to them. I would respectfully ask that this Court afford him the same consideration, dignity and respect he has demonstrated to his friends, family and clients" (Leila Biundo); "He is a mentor to me and so many of our young people here in Allentown, PA" (Art Baylis); "the caring and honest man I know is being made out to be something he is not by local news and media. . . John Karoly is an honest, caring, generous and decent man, and he deserves the same treatment he has displayed to others throughout his lifetime" (Abbas Jafferali); "I have seen John help students with legal issues on a pro bono basis" (Bruce Gover); "a good and honorable man" (Betsy Gover); "always a positive influence whether coaching or simply attending these events" (John Bassler); "an absolute advocate for helping the little guy" (Thomas George); "John has managed to be involved in all aspects of the community. As a volunteer I appreciate what he has done to help our youth" (Tonilynn Fay); "Since I have known him, which has been more than 30 years, he has always been a first responder to many Lehigh Valley athletes . . . John is and always will be one of the best people to ever come out of Lehigh County" (George Atiyeh); "he has always been there and helped out the less fortunate. John has always been on the side of justice for the common person" (Joanne Branney); "The John Karoly whom I know is certainly not the man who is portrayed in the media" (Elisabeth Gates); "I know him to be honest, hardworking and a caring man who gives his all to God, his clients and his family everyday" (Minister Donald Watson); "to sum him up, he is an incredible man with a big heart. He is a man that would put someone before himself, a true friend and father figure and I thank God he placed him in my life

DTI 871029v1 05/03/10

(Jermaine Herod); "John is one of the most outstanding individuals I have met" (Christopher Zalasky); "this ability to affect the lives of others in a positive and meaningful way has made him a success in his professional, and more importantly, his personal life" (Adam Bonagura); "When I've asked John in the past why he has taken certain cases since the public is criticizing him in the public newspapers, radio and television, he would remind me that people's opinion of him weren't his concern; it was the injustice that was done. To me that is the meaning of honor, character, and public service. In all my years of knowing John on a very personal level, it is a fair characterization to say he has lived his life to serve others" (George Kanupka IV); "a gentleman, a scholar and a bonafide champion of the "Little Guy" regardless of social consequences. Attorney Karoly has gone above and beyond, sometimes risking his own reputation, to bring justice to the less fortunate among us" (William Dupree MD); "I have always found John to be honest, forthright and fair. I admired the empathy and determination he always showed for his client's cause" (Michael McIntyre, Esq., former First Assistant District Attorney Lehigh County); "selfless dedication to, and concern for, the rights and well being of his clients and those in his community" (Robert Davis, Jr., Esq., former Chief Counsel to the Disciplinary Board for the PA Supreme Court); "John Karoly has been a constant supporter of Kidspeace" (Mindy Heidecker); "Mr. Karoly is a man who is defined by his unquestionable honesty, loyalty, integrity, compassion and selflessness" (Bryan Roberts, Esq.); "commitment to protecting the rights of those who have been wronged – even if this commitment has made him unpopular in our small town" (Abigail Fota, Esq.); "John has given more to the profession then will ever have been taken away by his indiscretion" (Glenn McGogney, Esq.).

Other letters speak of the conduct which has brought him before the Court as being against Mr. Karoly's grain: "this case is an exception and not an example of the way John P.

DTI 871029v1 05/03/10

Karoly Jr. has lived his life" (Bruce Rothrock, Sr.). Others address the lack of risk of recidivism: "Taking John away from his loving family and the citizens he has so ably represented will serve no purpose but to punish those in need. And I can tell you, personally, that Attorney Karoly has already been punished severely by the loss of his practice, his public embarrassment, and the ability to mentor his two sons in the law, a lifelong goal of his which now has been placed in jeopardy" (Martin Hacker); "He is also very creative and I'm sure he will find a way to make an honest living if he is free to live in and amongst society again" (Bruce Rothrock, Sr.); "I believe he can still do so much more with his experience in law and be a great benefit to society given that chance" (Ryan George); "Punishment by long confinement would only interrupt and perhaps stifle his desire to continue a life of exemplary contributions to society" (Linda Beers); "I understand that John has made mistakes. But I think our community is a better place because John is in it" (Gary Moyer).

The hundred fifty plus letters provided to the Court counter the narrow picture of Mr. Karoly that the government wishes the Court to consider. We learn that he indeed has had a passion to assist the youth in his community and that scores of these young men have profited from that experience. They consider Mr. Karoly as a role model, a father figure, a listening ear. We learn that he has assisted in supporting the urban youth and in committing his resources to support the provision of sporting opportunities. We see a three dimensional figure that towers over the cutout figure that the government has strenuously attempted to depict. These letters are from the downtrodden, the successful professionals, blue collar workers, members of the military, teachers, executives, business leaders and the core of the community. They highlight the tragedy not only to Mr. Karoly but also to society if the government gets its way and commits Mr. Karoly to an effective life sentence. These letters are extremely powerful evidence

DT1 871029v1 05/03/10

of mitigation in the Court's sentencing. In determining the proper sentence in this case, the Court should consider the good that Mr. Karoly has performed throughout his life and the esteem with which he is held by those who know him.

As an attorney for over 35 years, Karoly provided legal services pro bono to scores of individuals. He championed the unpopular causes and had the temerity to hold law enforcement accountable for unconstitutional acts. Although there is a segment of law enforcement and community members that personally hold accountable an attorney who hits back at authority hard, our society and legal community are best served by having had the voice of John Karoly. Mr. Karoly has made great contributions therefore to the Public Interest by making those in authority cognizant that the acts of government are accountable by a vigilant practitioner of law.

Mr. Karoly has also demonstrated a strong moral character as exemplified in the letters. He is known to be both fair and generous with his time, counsel and commitment. He is simply not the man depicted by the government. He is devoted to his family and the letters describe Mr. Karoly's sons in flattering terms as having been the beneficiaries of their father's constant presence and guidance. The Supreme Court has recognized that "it has been 'uniform and constant in the federal judicial tradition' for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate . . . the crime and punishment to ensue." *United States v. Koon*, 518 U.S. 81, 113 (1996). We ask for the same consideration from this Court.

## VI. The Requirements of Section 3553(a)(2)

### A. The Nature and Circumstance of the Offenses

Under §3553(a)(1), the Court must analyze "the nature and circumstances" of the offenses. To be sure, tax violations, fraud and money laundering are serious crimes. Tragically,

they are too often seen by the courts. A proper sentence however must balance the serious nature of the offenses with the other factors articulated in Section 3553. It is submitted that the sentence advanced by the government tilts the balance in favor of retribution against this defendant by pushing for the warehousing of the individual when it is obviously not required or appropriate to do so. The atypical nature of the fraud and money laundering case has been previously discussed within this memorandum and does not require restating here.

It is important to again bring to the attention of the Court that at the time that Mr. Karoly began to use the charitable contribution for his own purpose, he had just completed open heart surgery. Shortly thereafter, his brother and sister-in-law died in a tragic plane crash. The first converted money was used by Mr. Karoly to pay funeral expenses and to pay for catering for funeral attendees. This is not offered as an excuse but is relevant for due consideration. Following the burials of his relations, Mr. Karoly continued to be bedridden for two months and then out of the office for about six months with the resulting loss of income to his practice. Taking the charitable contribution back appeared at that time to be a way to keep the practice afloat. Unlike other fraud cases appearing before the Court, Mr. Karoly set forth to take back money he had lawfully earned through hard work and had previously committed to charity. In his mind at that time, he was taking back his money. An error to be sure but different in scale from others who take money that never belonged to them.

Taking into consideration the nature of his offense conduct, the facts of Mr. Karoly's case are more akin to tax violations than it is to the typical fraud/money laundering offense. The fraud/money laundering guideline overstates both the degree of Karoly's criminality and his need to be corrected. *See United States v. Stuart*, 22 F.3d 76, 82 (3d Cir. 1994); *see also United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996)("Fraudulent schemes . . . come in various forms, and

DT1 871029v1 05/03/10

we must consider the nature of the scheme in determining what method is to be used to calculate the harm caused or intended.").

A broader picture of the tax violations was also provided at the tax loss hearings. Rather than depicting an organized and well planned tax scheme, the evidence showed that a great deal of the tax liability was the result of bad record keeping, negligence and lack of diligence. To be sure, Mr. Karoly is responsible ultimately for the false returns but a better picture of the offense is now clear to the Court.

## B. Deterrence of Future Criminal Conduct and Promote Respect for the Law

This is the first offense for Mr. Karoly who will under any sentence be subject to a lengthy period of supervision by the government and probation. Mr. Karoly's present situation as outlined in this memorandum's opening section establishes that Karoly has felt the full force of the government's power and he knows that the government will be ever vigilant at looking at him for any future transgressions. Mr. Karoly has already felt a heavy hand of deterrence and his professional career has ended. As stated earlier no one can say that Karoly has been treated lightly by the government or Court. His indictments, plea, convictions and sentencing make regular front page copy for a host of newspapers and open the nightly local television news. If anything, the public and Mr. Karoly have learned of the seriousness nature of the offenses and what the government can bring to bear on the transgressor. His penalties include millions of dollars of taxes, penalties and interest and the deprivation of the right to earn additional money for a man at the zenith of his career.

Mr. Karoly has led an otherwise exemplary life and has retained reputable tax professionals to file correct returns and to install in his business measures to ensure that proper tax returns will become the regimen.

DTI 871029v1 05/03/10

Mr. Karoly does not present a risk of recidivism and is a first-time, non-violent offender. A below guideline sentence with promote respect for the law since the sentence would conform with the law and be a recognition that each sentencing is unique and requires the Court to adopt a sentence finely tuned to the individual characteristics of each offense and defendant. In addition, an unduly harsh sentence may "engender derision for the law". *See Coughlin*, 2008 WL 313099, at *5. "[I]t is not severe punishment that promotes respect for the law, it is appropriate punishment... unduly severe punishment can negatively affect the public's attitude toward the law and toward the justice system." *United States v. Olhovsky*, 200 U.S. App. LEXIS 7895 at *56-57 (3d Cir. 2009)(vacating a sentence because the trial court failed to adequately consider and give weight to all of the 3553(a) factors even though the sentence imposed was below the recommended sentencing guideline). A below guideline sentence would also promote respect for the proposition that a life of good works will not be ignored.

In adjudging the appropriate sentence for a first time non-violent offender like Mr. Karoly it is helpful to consider that the Sentencing Commission is moving toward the passage of amendments that recognize the need for sentencing alternatives for the individual who is not at risk of repeating his offenses. The Commission has voted to approve Sentencing Guideline Amendments which, unless Congress unexpectedly rejects them, would take effect on November 1, 2010. It is the sense of most commentators that these amendments are system altering, by the Commission's own design. Among the most important of these changes involve encouraging the use of more alternatives to incarceration and considering individual offender characteristics which, under the present guidelines were only considered in multiples. The Commissions own press release regarding the changes states, in its introduction to the changes:

WASHINGTON, D.C. - The United States Sentencing Commission voted to promulgate sentencing guideline amendments that expand the availability of alternatives to incarceration and address the relevance of certain specific offender characteristics in sentencing.

That same Press Release concludes that the amendments were definitely needed and, supported by the entire criminal justice community.

"The Commission has heard from virtually every sector of the criminal justice community that there is a great need for alternatives to incarceration," said Chair of the Commission, William K. Sessions III. "Expanding the availability of alternatives to straight incarceration is a public safety issue. Providing flexibility in sentencing for certain low-level, non violent offenders helps lower recidivism, is cost effective, and protects the public. The Commission's action in this area amounts to a very modest but important step in the right direction."

Moreover, the Commission solicited further comment on "what revisions to Chapter Five, Part B (Probation), and Chapter Five, Part F (Sentencing Options), may be appropriate to provide more guidance on the use of alternatives to incarceration". Federal Register, Vol. 75, No. 13., January 21, 2010, p. 3529.

The Commission emphasized that the amendments and further revisions were aimed at both meeting the statutory purposes of sentencing and, keeping with the Commission's mandate not to incarcerate first time non-violent offenders.

"Are there changes the Commission should make to the guidelines to guide courts in fashioning sentences that meet the statutory purposes of sentencing, see 18 U.S.C. 3553 (a)(2), and to better implement the requirements of 28 U.S.C. 994(j) **(requiring the Commission to ensure that "the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense")?** (Emphasis added, Id.)

DTI 871029v1 05/03/10

The Commission also made it clear in its publication of the proposed amendments that it was considering how the Commission should amend the Guidelines Manual to more adequately address "five specific offender characteristics in particular."

> "Those characteristics, and the statutes and policy statements currently addressing those characteristics, are as follows:
> (1) Age (28 U.S.C. 994(d)(1), see §5H1.1 (Age).
> (2) Mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant (28 U.S.C. 994(d)(4), see §5H1.3 (Mental and Emotional Conditions).
> (3) Physical condition, including drug dependence (28 U.S.C. 994(d)(5), see §5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction).
>
> (4) Military, civic, charitable, or public service, employment related contributions, record of prior good works, see §5H1.11 (Military, Civil, Employment-Related Contributions; Record of Prior Good Works).
>
> (5) Lack of guidance as a youth, see §5H1.12 (Lack of Guidance as a Youth and Similar Circumstances).

In short, an enlightened sentencing judge will consider the direction the Commission wishes to impart to the federal courts so that our sentencing system will reflect the true goals it was intended to embrace. In particular, three of the five offender characteristics which the Commission suggests ought to be reviewed by the sentencing Court as relates to "the general appropriateness of imposing a sentence of other than imprisonment in cases in which the defendant is a first time offender" as well as "the use of alternatives to incarceration," clearly apply to Mr. Karoly.

VIII.   **Sentencing Recommendation**

There are cases where even before sentencing takes place that a defendant is already severely impacted by the results of his offenses. John Karoly, Jr. has already faced public rebuke

DT1 871029v1 05/03/10

in newspaper and television reports. He has been castigated in public pronouncements by the government. He will very soon lose his professional license and his financial resources have been depleted. John Karoly has borne the full strength of the government's very public investigation and prosecution. His character has been assaulted and dissected. He has borne public humiliation and pillory. He will have to pay back untold millions of dollars in taxes, penalties and interest. His lifelong goal of practicing law with his two sons has been shattered and his ability to provide for an ailing wife has been extinguished.

Under the circumstances of this case, we respectfully request the Court to impose the minimum sentence necessary to comply with the factors set forth in a § 3553 and which will enable Mr. Karoly to continue his great contributions to the community. This would allow Mr. Karoly to get to work on re-starting a positive life, renewing gainful employment, and permit him to repay his debt to the IRS. Accepting the government's position would merely result in the discarding to an overstressed penal system a good person who committed bad acts. The life of Mr. Karoly is humbly presented to this Court for proper consideration.

The central determination for this Court, it is respectfully submitted, is whether the aggressive sentencing position of the government which seeks every imaginable enhancement while disdaining judicial discretion, is just, fair and required in this case. Within a half hour after the Court imposes its sentencing, the government will declare victory for defeating a prominent attorney and search the papers the following day to discover whether any of its favored quotes have been published to the public. In the meantime, the life of a professional who committed his lifelong energies to serve his fellow man will lay in tatters. The people who truly know the dignity and dedication of Mr. Karoly, await the Court's decision. The wisdom of this Court is sought and anticipated.

DT1 871029v1 05/03/10

Respectfully submitted,


/s/Robert E. Goldman, Esquire
Robert E. Goldman, Esq.
*Attorney for the Defendant*

Date: May 3, 2010

DT1 871029v1 05/03/10

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Defendant's Sentencing Memorandum has been

served electronically through the District Court Electronic Case System and by first class mail upon:


AUSA Seth Weber
504 W. Hamilton, Street
Allentown, PA.

Thomas Bergstrom, Esq.
138 Davis Road
Malvern, PA 19355

Brian McMonagle, Esq.
1 Penn Square West
30 S. 15th Street, Suite 701
Philadelphia, PA 19102



DATE: May 3, 2010

/s/Robert E. Goldman, Esquire
Robert E. Goldman, Esq.
P.O. Box 239
Fountainville, PA 18923
*Counsel for Defendant*
*John P. Karoly, Jr.*

DTI 871029v1 05/03/10